IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **Y-Z-L-H**, an adult,<br><br>          Petitioner,<br><br>      v.<br><br>**DREW BOSTOCK**, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations; **TODD LYONS**, Acting Director of Immigration and Customs Enforcement; **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**; **KRISTI NOEM**, Secretary of the Department of Homeland Security; and **PAMELA BONDI**, Attorney General of the United States,<br><br>          Respondents. | Case No. 3:25-cv-965-SI<br><br>Agency No. AXXX-XXX-204<br><br>**OPINION AND ORDER GRANTING PETITION FOR HABEAS CORPUS** |

Tess Hellgren, Stephen W. Manning, Nelly Garcia Orjuela, and Jordan Cunnings, INNOVATION LAW LAB, 333 SW Fifth Avenue, Suite 200, Portland, OR 97204. Of Attorneys for Petitioner.

William M. Narus, Acting United States Attorney; and Joshua Keller and Ariana N. Garousi, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Respondents.

**Michael H. Simon, District Judge.**

In the spring of 2023, a 22-year-old man was lawfully working in Mexico as a farmer on his family's ranch.[1] One of the most notorious and violent criminal drug cartels in Mexico was operating in the region under the protection of a corrupt local chief of police. The police chief told the young man that members of the cartel would soon be coming for him. Shortly thereafter, others confirmed to the man that members of the cartel were heading to "pick him up." The young man was fearful that the cartel would force him to work for them and, if he refused, would torture and kill him. The man knew that they had done that to others who were about his age. Not wanting to work for a drug cartel, and not wanting to be tortured and killed, the man presented himself to officers of the U.S. Customs and Border Protection agency ("CBP") at the United States port of entry in El Paso, Texas. He used a "CBP One" mobile app on his phone to make these arrangements, which was the procedure recommended by CBP.

Upon presentation at the port of entry, the man would have otherwise been mandatorily detained, but he expressed his intent to seek asylum. He was then interviewed by CBP officers to review his potential asylum status and determine whether he presented a security risk or a risk of absconding. Based on the man's individualized facts and circumstances, he was granted permission lawfully to enter (also known as being "paroled into") the United States on a temporary basis while he pursued his applications for asylum and withholding of removal under the Convention Against Torture ("CAT"). Thus, on July 21, 2023, this man was permitted lawfully to enter and remain in the United States while his immigration proceedings progressed.

---

[1] For Petitioner's safety, the Court has allowed him to proceed using only initials or a generic descriptor. The parties know the man's identity.

So far, everything had been done precisely as Congress had directed under federal immigration laws, including 8 U.S.C. §§ 1182(d)(5) and 1225.

While his immigration case was pending, the young man lived in Newport, Oregon. The man had originally been directed to appear for a hearing on May 7, 2024, but that was later postponed by immigration authorities, who sent an amended Notice to Appear letter. In that letter, the man was directed to appear on June 5, 2025, in Portland before an Immigration Judge employed by the U.S. Department of Justice. Immigration authorities also had previously issued the man an employment authorization card, which allowed him legally to work in the United States. This work permit was initially valid through July 19, 2025, and immigration authorities later issued a new work permit, which was valid through June 30, 2030. While living in Newport, the man was gainfully—and lawfully—employed, first as a dishwasher, and later as a painter. He kept U.S. immigration authorities aware of his correct address and complied with all required check-ins.

On April 11, 2025, the U.S. Department of Homeland Security ("DHS") sent emails to tens of thousands of persons who similarly had been lawfully paroled into the United States and allowed to remain for a limited time as they tried to accomplish the individualized purposes of their parole. These standard-form, mass emails sent by DHS stated that "DHS is now exercising its discretion to terminate your parole." The emails added that any benefits connected to a person's parole, "such as work authorization," also will terminate. The emails advised each recipient to "depart the United States immediately."

Rather than depart, the young man attended his previously scheduled hearing before an Immigration Judge in Portland on June 5, 2025. The young man identified himself to the Immigration Judge, and the Immigration Judge began by explaining that the "purpose of these

proceedings is for the court to decide whether you should be removed from the United States or whether you should be allowed to stay." The Immigration Judge also stated that both the man and the Government have the right to present testimony and other evidence regarding the man's application for asylum and withholding of removal. After the Immigration Judge spoke with the man about some preliminary matters, the Government addressed the Immigration Judge to say that "DHS is moving for dismissal based on changed circumstances since the issuance of the Notice to Appear." The Immigration Judge asked the young man if he objected or wanted the Immigration Judge to grant the Government's motion. The man said that he objected and did not want his case to be dismissed. He added that he also wanted time to obtain a lawyer. The Immigration Judge then spoke to the parties "off the record" and, upon returning, stated that he was granting the Government's motion to dismiss the "removal case," explaining to the man that he was no longer in official removal proceedings. The Immigration Judge added that the man would still have the right to seek legal representation and could appeal the Immigration Judge's ruling. The Immigration Judge then told the man, "You are now free to leave." The man left the courtroom, entered the hallway, and was promptly taken into custody by five or six masked agents of U.S. Immigration and Customs Enforcement ("ICE").

A volunteer lawyer standing nearby agreed to represent the man and promptly filed a Petition for Habeas Corpus (the "Petition") with the federal court in the District of Oregon, which is now the subject of this Opinion and Order. After the Petition was filed but before the Court entered an interlocutory order several hours later, ICE removed the man from Oregon and eventually placed him in an ICE detention facility in Tacoma, Washington. The parties have

since filed legal briefs, and the U.S. District Court held a hearing on July 1, 2025.[2] At the

hearing, the Government conceded that if the email sent on April 11th did not lawfully rescind

the man's parole, then his arrest on June 5th and subsequent detention by ICE would not be

lawful. At the conclusion of the hearing, this Court orally ruled that the April 11th email did not

lawfully rescind the man's parole because the procedures used materially violated federal

immigration laws and regulations.

Accordingly, the man's arrest and subsequent detention also were unlawful. The Court

ordered the Government to release the man and stated that a written Opinion and Order

explaining the Court's analysis and legal basis would be issued by July 11th. The Court later

learned that the man had been released later that evening, after the hearing and the Court's oral

ruling. This Opinion and Order now provides the Court's analysis and legal basis in support of

its ruling. For the reasons explained below, the Court finds that the Government's termination of

the man's parole was unlawful, as well as arbitrary and capricious under the APA.

In 1947, shortly after the end of the Second World War, Justice Felix Frankfurter of the

United States Supreme Court wrote a separate opinion in *United States v. United Mine Workers

of America*.[3] In that case, Justice Frankfurter stated:

> There can be no free society without law administered through an
> independent judiciary. If one man can be allowed to determine for
> himself what is law, every man can. That means first chaos, then
> tyranny. Legal process is an essential part of the democratic
> process. For legal process is subject to democratic control by
> defined, orderly ways which themselves are part of law. In a

---

[2] Although the Petition raised several alternative arguments in support of habeas relief,
the parties stipulated that the July 1st hearing would address only Count Two, which asserted
that the termination of the man's parole was unlawful under the Administrative Procedure Act
("APA"), thereby making his arrest and detention also unlawful.

[3] 330 U.S. 258 (1947).

democracy, power implies responsibility. The greater the power
that defies law the less tolerant can this Court be of defiance.[4]

Almost 80 years later, these principles continue to protect the rights of everyone.

## BACKGROUND

### A. Relevant Statutory Framework

#### 1. Admission Processes and Parole Under the INA

The Immigration and Naturalization Act ("INA") establishes the framework governing
noncitizens' entry into and removal from the United States, with regulations promulgated by the
enforcing agencies providing further governance. When a noncitizen arrives seeking entry into
the United States, they are deemed an "applicant for admission."[5] The INA has many categories
of "inadmissibility."[6] Noncitizens who arrive at a port of entry without a visa or other entry
document, like Petitioner, are deemed "inadmissible" under 8 U.S.C. § 1182(a)(7).[7]

When a noncitizen is deemed inadmissible under § 1182(a)(7), the immigration officer
must order the noncitizen's removal, unless the noncitizen indicates an intention to apply for
asylum or fear of persecution.[8] The noncitizen may be placed in "expedited removal"
proceedings, which contain a truncated asylum process and require that the noncitizen remain
detained throughout the process.[9] They also may be placed in 8 U.S.C. § 1229a removal

---

[4] *Id.* at 312 (Frankfurter, J., concurring in the judgment).

[5] 8 U.S.C. § 1225(a)(1).

[6] *See generally* 8 U.S.C. § 1182.

[7] Depending on the circumstances, other categories of inadmissibility may also apply, but
§ 1182(a)(7) applies for noncitizens without proper documentation.

[8] 8 U.S.C. § 1225(b)(1)(A)(i).

[9] *Id.* § 1225(b)(1).

proceedings, which have more robust due process protections, although the noncitizen again generally remains detained throughout the process.[10]

Section 1182, however, has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:

> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien *and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served* the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A)[11] (emphasis added) ("Parole Statute"). "Notably, every Administration beginning in the late 1990s has relied heavily on the parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden."[12] At issue in this case is the termination of Petitioner's parole.

---

[10] *Id.* § 1225(b)(2).

[11] An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

[12] *Biden v. Texas*, 597 U.S. 785, 815 (2022) (Kavanaugh, J., concurring).

### 2.  Limits on Judicial Review Under the INA

The INA contains a provision limiting judicial review. Respondents rely on this provision to argue that the Court is unable to review Respondents' purported termination of Petitioner's parole. In a subsection titled "Denials of discretionary relief," the statute states, in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security *the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security*, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B) (emphasis added) ("Review Statute").[13]

### 3.  Habeas Corpus Petitions Under 28 U.S.C. § 2241

Under 28 U.S.C. § 2241, federal district courts "within their respective jurisdictions" have the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States." The "essence of habeas corpus is an attack by a person in custody upon the legality of that custody," and thus to be within the "core of habeas corpus," a petitioner must seek "either immediate release from that confinement or the shortening of its duration."[14]

---

[13] Subchapter II, titled "Immigration," includes § 1182.

[14] *Preiser v. Rodriguez*, 411 U.S. 475, 484, 489 (1973).

## B.  Factual Background

Petitioner now is a 24-year-old citizen of Mexico. More than two years ago, Petitioner feared that a notorious and violent drug cartel in Mexico, working under the protection of a corrupt local police chief, would torture and kill Petitioner if he did not join the cartel and begin doing their bidding.[15] After making an appointment through the "CBP One app" for entry into the United States, on July 21, 2023, Petitioner came to the port of entry at El Paso, Texas and explained that he was seeking asylum and withholding from removal under the CAT.[16] At the port of entry, Petitioner was deemed inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) because he was not in possession of valid entry documents.[17]

He was, however, paroled into the United States under the Parole Statute.[18] Petitioner was thus released from custody. He also was not placed into "expedited removal" under § 1225(b)(1) but was instead placed into regular § 1229a removal proceedings under § 1225(b)(2). He was ordered to appear for his first court hearing on May 7, 2024, in Portland, Oregon.[19] Petitioner later received a notice in the mail that his first court hearing had been rescheduled for June 5, 2025, in Portland.[20] On September 28, 2023, Petitioner was issued a work authorization that was

---

[15] ECF 22 at 9-17.

[16] Declaration of Y-Z-L-H (ECF 14) ¶¶ 3, 4.

[17] *See* ECF 22 at 2-5.

[18] *See id.* at 2.

[19] *Id.*

[20] Y-Z-L-H Decl. ¶ 4.

valid through July 19, 2025.[21] On July 9, 2024, Petitioner timely filed his application for asylum

or withholding of removal under the CAT.[22]

On April 11, 2025, Petitioner received an email from Department of Homeland Security

("DHS") stating:

> Notice of Termination of Parole
>
> It is time for you to leave the United States.
> You are currently here because the Department of Homeland
> Security (DHS) paroled you into the United States for a limited
> period. Pursuant to 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R.
> § 212.5(e), DHS is now exercising its discretion to terminate your
> parole. Unless it expires sooner, your parole will terminate 7 days
> from the date of this notice.
>
> If you do not depart the United States *immediately* you will be
> subject to potential law enforcement actions that will result in your
> removal from the United States—unless you have otherwise
> obtained a lawful basis to remain here. Any benefits you receive in
> the United States connected with your parole—such as work
> authorization—will also terminate. You will be subject to potential
> criminal prosecution, civil fines, and penalties, and other lawful
> options available to the federal government.
>
> DHS encourages you to leave immediately on your own.
>
> . . .
>
> Again, DHS is terminating your parole. Do not attempt to remain
> in the United States – the federal government will find you. Please
> depart the United States immediately.

---

[21] ECF 22 at 21.

[22] *See id.* at 9-20.

PAGE 10 – OPINION AND ORDER GRANTING PETITION FOR HABEAS CORPUS

ECF 22 at 22 (emphasis in original). This was a mass, form email sent to tens of thousands of migrants[23] and did not reference Petitioner's pending asylum application.

Petitioner remained in the United States. He previously had been issued a work authorization valid from September 28, 2023, through July 19, 2025.[24] This work permit was based on his status as someone who had been paroled into the United States. On May 16, 2025, Petitioner filed an application for a work authorization pursuant to his status as a noncitizen seeking asylum.[25] U.S. Citizenship and Immigration Services ("USCIS") granted Petitioner a new work authorization on June 4, 2025, which is valid until June 3, 2030.[26] This work permit is based on his status as a noncitizen seeking asylum.

On June 5, 2025, Petitioner appeared for his immigration court hearing. Petitioner requested more time to try to find an attorney and the Immigration Judge stated, "the court will give you more time, and we'll reschedule your case to another day."[27] DHS then orally moved for dismissal of the removal proceedings, including Petitioner's asylum application, "based on changed circumstances since the issuance of the Notice to Appear."[28] DHS, however, did not describe the purported "changed circumstances" or articulate any other reasons for seeking

---

[23] Miriam Jordan, Jazmine Ulloa & Hamed Aleaziz, *They Followed the Rules. Now Thousands of Migrants Are Told, "Leave,"* N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/us/migrants-trump.html.

[24] ECF 22 at 21.

[25] *Id.* at 24.

[26] *Id.*

[27] *Id.* at 27 ("Rough Transcript of DAR Audio" from June 5, 2025).

[28] *Id.*

dismissal.[29] Petitioner opposed the motion, stating that he first needed a lawyer. The Immigration

Judge held a discussion off the record before stating on the record: "The court has considered the

department's motion for dismissal. And the court has considered the respondent's opposition

requesting an attorney. The court finds the department has offered more persuasive reasons for

seeking dismissal."[30] In orally granting the motion, the Immigration Judge noted a Board of

Immigration Appeals ("BIA") case finding no prejudice where the respondent had not been

ordered removed and was in no imminent danger of removal.[31] The Immigration Judge dismissed

the removal proceedings without prejudice, vacated any future hearings, and stated that

Petitioner was no longer in removal proceedings.[32] After the hearing, the Immigration Judge

entered a written order dismissing without prejudice Petitioner's removal proceedings.[33]

After Petitioner left the courtroom, about five or six ICE agents in masks surrounded

him.[34] The agents seized Petitioner's mobile phone and other belongings and placed him in

handcuffs.[35] The agents did not explain why they arrested Petitioner.[36] They took Petitioner to an

unknown location where they placed him in shackles.[37] They again did not provide any

---

[29] *Id.*

[30] *Id.* at 27-28.

[31] *Id.* at 28.

[32] *Id.*

[33] ECF 11-2.

[34] Y-Z-L-H Decl. ¶ 7.

[35] *Id.*

[36] *Id.*

[37] *Id.* ¶ 10.

explanation about where they had taken Petitioner, where they were going, or why they had arrested Petitioner.[38] Petitioner was scared and alone, having never been arrested, and feeling confused because he had followed all the requirements for applying for asylum.[39] Petitioner was then taken to Tukwila, Washington.[40] After spending the night in a cell in Tukwila, in the afternoon of June 6, 2025, Petitioner was shackled and handcuffed and transferred to the Northwest ICE Processing Center in Tacoma ("Tacoma Detention Facility").[41] As of June 17, 2025, he had been detained in his cell at Tacoma for nearly one week without ever being taken outside.[42] Petitioner remains confused regarding his arrest, because he has no criminal history, either in Mexico or the United States.[43]

Respondents concede that Petitioner is not currently in "expedited removal" proceedings. Respondents further concede that Petitioner remains in removal proceedings under 8 U.S.C. § 1229a during his administrative appeal of the dismissal of his removal proceedings.

At 11:21 a.m. on June 5, 2025, Petitioner, through counsel, filed his Petition. At 4:15 p.m. the same day, the Court issued an Order prohibiting Respondents from transferring Petitioner out of the District of Oregon without prior approval of the Court, ordering Respondents to notify the Court if Respondents already had transferred Petitioner out of the District of Oregon, and ordering Respondents to answer or respond to the Petition by June 10,

---

[38] *Id.* ¶¶ 9-10

[39] *Id.* ¶¶ 7-9.

[40] *Id.* ¶ 10.

[41] *Id.* ¶¶ 11-12.

[42] *Id.* ¶¶ 13-14.

[43] *Id.* ¶ 15.

2025.[44] Counsel for Respondents notified the Court by email on June 5, 2024 at 4:55 p.m. that DHS had removed Petitioner from the District of Oregon at approximately 12:30 p.m. on June 5, 2025.[45] The Court then ordered Respondents not to transport Petitioner from the Tacoma Detention Facility, other than to return Petitioner to the District of Oregon.[46] Petitioner remained in custody at the Tacoma Detention Facility until the Court orally granted the Petition on Count Two at the oral argument on July 1, 2025, stating that a written decision would follow.

## DISCUSSION

### A. Whether the Court Has Jurisdiction to Review This Matter

#### 1. Statutorily Granted Discretion

Respondents make two arguments in support of their position that this Court lacks jurisdiction to review the decision to detain Petitioner. First, Respondents invoke the jurisdiction-stripping provision of the Review Statute, which precludes a court's jurisdiction to review any decision that is specified by the statute to be in the discretion of the Secretary of Homeland Security ("Secretary"). Respondents argue that Petitioner's detention is based on a discretionary decision to terminate parole under the Parole Statute, after which Respondents were required to detain Petitioner under 8 U.S.C. § 1225(b). Second, Respondents argue that § 701(a)(2) of the APA independently forecloses judicial review of any action "committed to agency discretion by law," quoting 5 U.S.C. § 701(a)(2). Both of these jurisdictional arguments are based on the contention that the decision to terminate Petitioner's parole was committed to agency discretion

---

[44] ECF 4.

[45] *See* ECF 7.

[46] *Id.*

by law. Thus, the Court analyzes whether termination of Petitioner's parole was a matter committed to agency discretion under the Parole Statute.

### a. Presumption of Judicial Review

In deciding whether a statute bars judicial review of an administrative determination, the Supreme Court has emphasized "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action."[47] "When a statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review."[48] The presumption of reviewability has been "consistently applied" to immigration statutes and can be overcome only by "clear and convincing evidence of congressional intent to preclude judicial review."[49] Accordingly, the Review Statute's limitation on judicial review applies only to determinations made discretionary by statute.[50]

Similarly, "[t]he APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action. That presumption can be rebutted by a showing that the relevant statute precludes review, § 701(a)(1), or that the agency action is committed to agency discretion by law, § 701(a)(2)."[51] "[O]nly upon a showing of 'clear and convincing evidence' of

---

[47] *Kucana v. Holder*, 558 U.S. 233, 251 (2010).

[48] *Id.* (quotation marks omitted).

[49] *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (quotation marks omitted).

[50] *Kucana*, 558 U.S. at 249-52; *see also Poursina v. U.S. Citizenship & Immigr. Servs.*, 936 F.3d 868, 871 (9th Cir. 2019) (holding that the Review Statute "precludes review only if a congressional statute—codified in the relevant subchapter, *see* 8 U.S.C. §§ 1151-1382—vests the government with authority to make a discretionary decision").

[51] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) (cleaned up).

a contrary legislative intent should the courts restrict access to judicial review."[52] Further, the Supreme Court has read the "committed to agency discretion" exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"[53]

### b. The Secretary's Discretionary Authority

The Parole Statute provides the Secretary with discretion to grant parole on a case-by-case basis for "urgent humanitarian reasons or significant public benefit"[54] After parole has been granted, the Secretary may only terminate parole "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served."[55] This is a grant of discretionary authority, but it has a mandatory requirement—parole may be terminated or revoked only when in the Secretary's opinion the parole's purposes have been met.

Agency action is not "specified . . . to be in the discretion" of the official where the action "was not performed in accordance with the mandatory . . . procedures."[56] In the context of granting parole, both the Supreme Court and the Ninth Circuit have acknowledged such mandatory procedures. Quoting the Supreme Court, the Ninth Circuit explained the bounds of

---

[52] *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967) (citing *Rusk v. Cort*, 369 U.S. 367, 379-80 (1962)).

[53] *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019).

[54] 8 U.S.C. § 1182(d)(5)(A).

[55] *Id.*

[56] *Sharkey v. Quarantillo*, 541 F.3d 75, 86 (2d Cir. 2008) (quotation marks omitted) (in the context of rescission of lawful permanent resident status, noting that the regulations "require formal proceedings, and a hearing upon request").

such discretion as follows: "immigration officials clearly have the authority to deny parole to unadmitted aliens *if they can advance a facially legitimate and bona fide reason for doing so*."[57]

Similarly, there are mandatory procedures for terminating parole. As discussed below in Section B.2, Respondents have failed to comply with the requirements imposed by statute (i.e., the parole has served its purpose) or by regulation (i.e., either the parole has served its purpose or neither public nor humanitarian interests support the continued presence of the noncitizen in the United States) for terminating parole. Further, the Supreme Court has stated that under the Parole Statute, immigration officials must "make individualized determinations" of *grants* of parole.[58] "Common sense suggests . . . that parole given only on a case-by-case basis is to be terminated only on such a basis."[59] Thus, the Review Statute only precludes review of terminations of parole that were done on a case-by-case, or individualized, basis. Here, the Secretary has not made any individualized determination that the purposes of a specific parole—and especially Petitioner's, for the purposes of the pending case—has been served. Instead, the Secretary purported to terminate categorically, or *en masse*, parole for tens of thousands of noncitizens. The Court finds persuasive the reasoning of the district court in *Doe v. Noem*, concluding that such a decision is not within the discretion granted by the Parole Statute.[60]

Similarly, the Ninth Circuit in *Hassan v. Chertoff* reviewed revocation of parole in the context of "advance parole," providing guidance on how a court should consider whether it has

---

[57] *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006) (emphasis added) (quoting *Jean v. Nelson*, 472 U.S. 846, 853 (1985)).

[58] *Jean*, 472 U.S. at 857.

[59] *Doe v. Noem*, 2025 WL 1505688, at *1 (1st Cir. May 5, 2025).

[60] *Doe v. Noem*, --- F. Supp. 3d ----, 2025 WL 1099602, at *11, 18 (D. Mass. Apr. 14, 2025).

PAGE 17 – OPINION AND ORDER GRANTING PETITION FOR HABEAS CORPUS

jurisdiction to review claims involving the revocation or termination of parole.[61] The Ninth Circuit analyzed whether the parole was properly revoked under the statutory and regulatory requirements before concluding that "[t]he revocation was lawfully authorized" and thus the district court properly concluded that it lacked jurisdiction.[62]

The plaintiff, Hassan, "while physically present in the United States . . . applied for adjustment to status of lawful permanent resident."[63] While his application was pending, Hassan wanted to travel to Saudi Arabia; he received an "advance parole" granting him permission to return to the United States "so long as his application for adjustment remained pending."[64] "While Hassan was abroad, the government denied his adjustment application and revoked the advance parole. When he attempted to return to the United States, he was denied admission, placed in expedited removal proceedings, and removed."[65] The Ninth Circuit thus explained:

> On appeal, Hassan argues that the district court had jurisdiction to review the revocation. He claims that the government lacked any discretion to revoke his advance parole because no statute or regulation expressly authorizes revocation. *We disagree. The statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose.*
>
> DHS complied with these regulations when it revoked Hassan's advance parole. It is undisputed that Hassan was granted advance parole solely to allow him to return to this country while his application for status adjustment was pending. Thus, once Hassan's application for adjustment of status was denied, he was no longer eligible for advance parole. The revocation inevitably

---

[61] 593 F.3d 785 (9th Cir. 2010).

[62] *Id.* at 789-90.

[63] *Id.* at 788.

[64] *Id.*

[65] *Id.*

PAGE 18 – OPINION AND ORDER GRANTING PETITION FOR HABEAS CORPUS

> followed from DHS's discretionary decision to deny the
> adjustment of status. Under these circumstances, DHS was
> required by its own regulation to terminate the advance parole, the
> parole having served its purpose.
>
> The district court properly rejected Hassan's argument that it had
> jurisdiction to review the revocation of advance parole as an ultra
> vires. The revocation was lawfully authorized.

*Hassan*, 593 F.3d at 789-90 (emphasis added) (citations omitted).

Unlike in *Hassan*, here, it is not undisputed that the purpose of Petitioner's parole was for a discrete function that has already been accomplished. (Indeed, it appears beyond reasonable dispute that the purpose of Petitioner's parole has not yet been served.) Nor is it clear that termination of Petitioner's parole (e.g., the April 11, 2025 email) has "inevitably followed" from some action by DHS regarding Petitioner's status or proceedings. That leaves the requirement that the Secretary make an affirmative decision based on facts that the purpose of Petitioner's parole has been served. And there is no evidence that the Secretary has expressed such an opinion. Thus, Respondents' termination of Petitioner's parole was not "lawfully authorized," and the Court retains jurisdiction to review the claim. Indeed, there has been no decision or action made or taken by the Secretary that the Parole Statute expressly provides is within the discretion of that official. Further, there is no clear and convincing evidence that Congress intended to preclude review of termination of parole under these circumstances.

Petitioner also argues that the Review Statute does not preclude review of challenges implicating the legal "backdrop" or "framework" against which discretionary decisions are made.[66] The Review Statute "restricts jurisdiction *only* with respect to the executive's exercise of

---

[66] *See* ECF 25 at 7-8; Hearing Tr. (ECF 29) 18:20-25.

discretion. It does not limit habeas jurisdiction over questions of law."[67] Accordingly, "[a]lthough the INA precludes direct review of discretionary decisions, it does not bar [courts] from reviewing predicate legal questions."[68] Such "predicate legal questions" include claims that the discretionary process itself was constitutionally or legally flawed.[69] Moreover, as the Supreme Court explained in *Zadvydas v. Davis*, there is an important distinction between seeking review of an exercise of discretion and "challeng[ing] the extent of . . . authority" under a statute.[70] "[T]he extent of that [statutory] authority is not a matter of discretion."[71] Under this principle, courts across the country have declined to apply the Review Statute "to claims challenging the legality of policies and processes governing discretionary decisions under the INA."[72] In the circumstances of this case, Petitioner's argument about the "legal backdrop"— whether Respondents can categorically terminate parole without an individualized determination—involves the same analysis as whether Respondents' termination decision complied with the mandatory statutory procedures.

---

[67] *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) (emphasis in *Hernandez*) (quotation marks omitted); *cf. United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (stating in the context of 8 U.S.C. § 1252(g) that a "district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary authority").

[68] *Gebhardt v. Nielsen*, 879 F.3d 980, 985 (9th Cir. 2018) (cleaned up).

[69] *Hernandez*, 872 F.3d at 988 (in the context of discretionary bond hearings).

[70] 533 U.S. 678, 688 (2001).

[71] *Id.*

[72] *Doe*, 2025 WL 1099602, at *12 (quotation marks omitted) (gathering cases).

Because this case involves the termination of parole, it is distinguishable from the cases relied on by Respondents in arguing that the Court lacks jurisdiction. In *Vazquez Romero v. Garland*, the Ninth Circuit held that under the Review Statute, the BIA correctly concluded that "it lacked authority to review the government's discretionary decision to parole a returning [Lawful Permanent Resident] into the United States" because the Parole Statute gave the Attorney General[73] the discretionary authority to parole a noncitizen *into* the United States.[74] That authority is not at issue here. Likewise, in *Syed v. Mayorkas*, the district court considered a plaintiff's application for a writ of mandamus compelling the defendants to approve the plaintiff's application for advance parole, which defendants had twice denied.[75] The district court held that under the Parole Statute, the decision whether to parole a noncitizen *into* the United States was committed to the discretion of the appropriate federal officer.[76] Thus, the denial of that petition could not be reviewed, pursuant to the express terms of the Review Statute. Again, Petitioner's claim is not about a decision by the Secretary or Attorney General to deny an application *for* parole.

In summary, the Review Statute does not preclude the Court's review, at least in the absence of an appropriate finding by an authorized official that "the purposes of such parole . . . have been served."[77] The Court does not review the Immigration Judge's decision to dismiss

---

[73] The Homeland Security Act of 2002 shifted most of the immigration responsibilities from the Attorney General to the Secretary of Homeland Security, and thus cases before 2003 reference the Attorney General.

[74] 999 F.3d 656, 665 (9th Cir. 2021).

[75] 2023 WL 6596330 (D. Or. Oct. 10, 2023).

[76] *Id.* at *3.

[77] 8 U.S.C. § 1182(d)(5)(A).

removal proceedings; that issue is appealed to the BIA. But the Review Statute and the Parole Statute do not preclude this District Court from reviewing whether the decision to terminate Petitioner's parole was lawful.

### 2. The Suspension Clause

As an alternative ground, Petitioner also argues that even if a statute did strip the Court of jurisdiction over Petitioner's claims, the Court would maintain jurisdiction under the Suspension Clause of the United States Constitution. This clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."[78] The Court agrees that if the Review Statute served to preclude the Court's jurisdiction, the Suspension Clause would permit the Court to review Petitioner's detention.

The Supreme Court in *Boumediene v. Bush* provided three factors for district courts to consider when "determining the reach of the Suspension Clause."[79] Those factors are: "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ."[80] For the first factor, courts compare the process that a detainee has actually been afforded with the "procedures and adversarial mechanisms that would eliminate the need for habeas corpus review."[81] At the second factor, that the apprehension and detention took place within the

---

[78] U.S. Const. Art. I § 9, cl. 2.

[79] 553 U.S. 723, 766 (2008).

[80] *Id.*

[81] *Id.* at 767.

United States weighs in favor of finding rights under the Suspension Clause.[82] And with respect

to the third factor, if government objectives—such as military missions or international

relationships—will be compromised if habeas corpus courts had jurisdiction to hear the

detainees' claims, that may weigh against application of the Suspension Clause.[83] In

*Boumediene*, the Supreme Court held that noncitizens detained at Guantanamo Bay had the

habeas corpus privilege and that § 7 of the Military Commissions Act of 2006 unconstitutionally

suspended the writ.[84]

In *Department of Homeland Security v. Thuraissigiam*, the Supreme Court provided an

analysis of the Suspension Clause in the immigration context.[85] Thuraissigiam, a noncitizen, was

apprehended within 25 yards of the border and detained for expedited removal.[86] He claimed a

fear of returning to his home country, Sri Lanka, because he had once been abducted and

severely beaten by a group of men, but he did not know who the men were or why they had

assaulted him.[87] He also affirmed that he did not fear persecution based on a protected

---

[82] *See id.* at 768; *see also Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1113 (9th Cir. 2019), *rev'd and remanded on other grounds sub nom. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020) ("As to the second factor, there is no question that Thuraissigiam was apprehended and detained within the sovereign territory of the United States. This factor weighs strongly in favor of finding Thuraissigiam has rights under the Suspension Clause.").

[83] *Boumediene*, 553 U.S. at 769-71.

[84] *Id.* at 732-33.

[85] 591 U.S. 103.

[86] *Id.* at 114.

[87] *Id.*

characteristic.[88] Based on this information, the asylum officer determined that Thuraissigiam lacked a credible fear of persecution and ordered him removed.[89] The supervising officer and an Immigration Judge agreed.[90] Thuraissigiam then filed a habeas petition, arguing that he was deprived of a "meaningful opportunity to establish his claims" and requesting a writ of habeas directing the government to provide him with "a new opportunity to apply for asylum and other applicable forms of relief."[91] The Supreme Court held that the Suspension Clause did not apply under these circumstances, as Thuraissigiam did not seek release from custody, but instead sought vacatur of his removal order and a new opportunity to apply for asylum.[92] The Supreme Court classified Thuraissigiam's requested relief as "the opportunity to remain lawfully in the United States," which "falls outside the scope of the writ [of habeas] as it was understood when the Constitution was adopted."[93] Justice Alito, writing for the majority, noted that "aliens who have established connections in this country have due process rights in deportation proceedings" as contrasted to "an alien at the threshold of initial entry."[94]

Justice Breyer concurred in the judgment, stating that "enforcing [the] limits [of § 1252(e)] *in this particular case* does not violate the Suspension Clause's constitutional

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.* at 114-15 (quotation marks omitted).

[92] *Id.* at 117-18.

[93] *Id.* at 119.

[94] *Id.* at 107.

command."[95] He cautioned, however, against going further than the facts of *Thuraissigiam*, and provided hypothetical scenarios in which the Suspension Clause may assure further review, such as where a person was detained years after arriving without documents and after they had started a life in the United States, where a person was ordered removed despite claiming to be a natural-born U.S. citizen, or where immigration officials "denied a refugee asylum based on [a] dead-wrong legal interpretation."[96] Justice Breyer explained that "[t]wo features of [Thuraissigiam's] case persuade [Justice Breyer]" that the Suspension Clause does not apply in this case: that Thuraissigiam "has never lived in, or been lawfully admitted to, the United States," and that Thuraissigiam seeks review of factual questions.[97]

Petitioner's case is readily distinguishable from *Thuraissigiam*. Petitioner does not seek "the opportunity to remain lawfully in the United States," but merely seeks release from custody—the traditional purpose of the habeas writ. Petitioner also was lawfully admitted to this country as opposed to being apprehended just inside the border, has lived here for nearly two years, has connections to the United States, and has been granted two work permits.

Under the *Boumediene* factors, and considering Justice Breyer's concurrence and the majority's distinguishing a migrant who is "at the threshold of initial entry" from one who is more established in this country, the Suspension Clause applies to Petitioner. For the first factor, although Petitioner is not a citizen, he has a much stronger status than the petitioners in *Boumediene* and *Thuraissigiam*. Petitioner was not apprehended only 25 yards from the border and immediately ordered removed, but was paroled into the United States and has remained here

---

[95] *Id.* at 150 (Breyer, J., concurring) (emphasis in *Thuraissigiam*).

[96] *Id.* at 150-51.

[97] *Id.* at 152-53.

PAGE 25 – OPINION AND ORDER GRANTING PETITION FOR HABEAS CORPUS

for nearly two years. During this time, Petitioner has received two separate work authorizations

and has developed significant ties to the community.

Considering the second factor, if the Review Statute were to deprive the Court of

jurisdiction to review Petitioner's detention, Petitioner would have no forum to challenge his

detention. In his current remaining immigration process, Petitioner has no right to challenge

Respondents' decision to terminate his parole.[98] Petitioner's pending BIA appeal addresses only

the removal proceedings,[99] and any expedited removal proceedings that Petitioner would be

placed in would evaluate only whether Petitioner has a credible fear of persecution.[100]

Additionally, Petitioner was apprehended and detained within the United States. Finally,

Respondents have not presented any credible arguments that any practical obstacles prevent

Petitioner from entitlement to the writ of habeas. There is no evidence that Petitioner is

dangerous or a flight risk—indeed, Respondents made the decision to parole Petitioner when he

arrived, without having any ties to the community or approved work authorizations, and in the

nearly two years since his entry into the country, Petitioner's ties to the United States have only

increased. Petitioner also has complied with the law during his presence in the United States.

Thus, even if the Review Statute precluded the Court from reviewing Respondents' decision to

---

[98] *Cf. Doe*, 2025 WL 1099602, at *13 (explaining that "there is no individual discretionary-relief process before an immigration judge (with appellate review of questions of law) as to the impending termination of the grant of parole or of the revocation of parole after it has occurred. Accordingly, if Section 1252(a)(2)(B)(ii) precludes a district court from considering Plaintiffs' challenges to Defendants' categorical actions at issue here, review of that question of law will not be preserved" (footnote omitted)).

[99] *See* 8 C.F.R. § 1003.1(b).

[100] *See* 8 U.S.C. § 1225(b)(1)(A)(i).

terminate Petitioner's parole, the Court would have jurisdiction to review this decision under the Suspension Clause.

## B. Whether ICE's Detention of Petitioner Violates the APA

Respondents conceded at oral argument that if they unlawfully terminated Petitioner's parole, then Respondents do not have a lawful basis for Petitioner's detention.[101] The Court thus focuses on whether Respondents' termination of Petitioner's parole was lawful under the APA.[102]

### 1. Legal Standards Under the APA

Under the APA, a court must "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."[103] Agency action is

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[101] Respondents also stated that they anticipate that if Petitioner's appeal of the dismissal of his removal proceedings is denied, they likely will detain Petitioner and place him into expedited removal. The Court notes, however, that Petitioner might not be eligible to be placed into § 1225(b)(1) expedited removal upon termination of parole. *See Doe*, 2025 WL 1099602, at *16-17 (rejecting DHS's argument that termination of parole allows for placement into expedited removal because 8 U.S.C. § 1225(b)(1) only applies to noncitizens "arriving in the United States" or who have entered unlawfully and have been present less than two years (quoting § 1225(b)(1))). This issue, however, is not currently before the Court, and the Court therefore expresses no opinion on this question.

[102] Petitioner argues that even if his parole was lawfully terminated, his detention was arbitrary and capricious. The Court declines to address this argument, because the Court concludes that Respondents did not lawfully terminate Petitioner's parole.

[103] 5 U.S.C. § 706(2).

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'"[104] "[A]n agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[105] A court "may not infer an agency's reasoning from mere silence"[106] because "it makes no difference what [an agency] may have had in mind but failed to express; an administrative agency is not allowed to change direction without some explanation of what it is doing and why."[107] As the Supreme Court has explained, "[a]n agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy," even though it need not convince the court of the merits of its new policy.[108] A court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."[109]

---

[104] *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 52).

[105] *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (cleaned up).

[106] *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (quotation marks omitted).

[107] *Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986).

[108] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted).

[109] *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (first alteration in original, remaining alterations added).

## 2. Failure to Meet Statutory and Regulatory Requirements

Respondents claim to have terminated Petitioner's parole effective April 18, 2025, through a mass distribution, standard-form email sent on April 11, 2025. Respondents contend that at that point, Petitioner "return[ed] to the custody from which he was paroled," and thus under § 1225(b), he was subject to mandatory detention.

Respondents purported to terminate Petitioner's parole under the Parole Statute. This provision authorizes the Secretary to grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and provides that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." Thus, under the statute, a noncitizen may not be "returned to the custody from which he was paroled" unless in the Secretary's opinion, "the purposes of such parole . . . have been served."

Petitioner was paroled into the United States based on his expressed intent to apply for asylum and withholding of removal under CAT. That was the "purpose" of his parole. The parties agree that his original parole expires by its own terms on July 19, 2025. Petitioner received a work permit through his initial entry process that also expires on July 19, 2025. Petitioner applied for asylum and withholding of removal on July 9, 2024. He then applied for a work permit as an asylum-seeker. DHS granted that work permit on June 4, 2025, and that permit expires in June 2030. The Immigration Judge dismissed Petitioner's asylum proceeding without prejudice and emphasized in his written order the relevance of the fact that Petitioner would still have avenues to pursue his claim for asylum. Respondents also concede that Petitioner is still in § 1229a removal proceedings. These facts show that the purpose of Petitioner's parole had not been served at the time of the purported termination. There is no

evidence, let alone any opinion or finding, to the contrary. Thus, Respondents fail to show that the Secretary has complied with the Parole Statute.

When asked at oral argument about the sufficiency of the grounds for the termination of parole, counsel for Respondents stated that the *only* requirement was that the Secretary provide "notice" and that was satisfied by the email sent on April 11, 2025. That, however, is not all that the Parole Statute requires. Under the governing regulations, upon written notice, DHS may terminate parole "upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."[110] Thus, written notice is a *necessary* but not a *sufficient* condition for compliance with this regulation.

The first clause of this regulation mirrors the Parole Statute. As discussed, that clause has not been met. But there is an alternate method of compliance, the second clause. Under this clause, the agency may terminate parole if an authorized official has found that humanitarian reasons and public benefit no longer warrant a noncitizen's presence in the country.

DHS has issued guidance on what it means for the presence of an asylum seeker, such as Petitioner, not to be in the "public benefit." As explained by U.S. District Judge James E. Boasberg,

> In 2009, DHS issued the "Parole Directive," which further fleshes out when, precisely, it is in the "public benefit" for an asylum-seeker to be paroled. *See* ICE Directive 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009). According to the Directive, if an asylum-seeker establishes her identity and that she presents neither a flight risk nor a danger to the public, her detention "is <u>not</u> in the public

---

[110] 8 C.F.R. § 212.5(e)(2)(i).

> interest," and thus ICE "<u>should</u>, absent additional factors . . . parole
> the alien." *Id.*, ¶ 6.2 (emphases added).

*Mons v. McAleenan*, 2019 WL 4225322, at *2 (D.D.C. Sept. 5, 2019).

Respondents offer no evidence that any authorized official found Petitioner to be a flight

risk or a danger to the public. Nor is there evidence that such an official found that humanitarian

reasons do not warrant Petitioner's presence in the United States. Thus, Respondents fail to show

that they complied with either clause of 8 C.F.R. § 212.5(e)(2)(i).

Counsel for Respondents also argued at the hearing that because the April 11th email

cited both the Parole Statute and 8 C.F.R. § 212.5(e)(2)(i) and stated that DHS was exercising its

discretion, those citations are sufficient to meet the statutory and regulatory requirements. As

noted, however, it is "impermissible to 'infer an agency's reasoning from mere silence.'"[111] The

email was silent as to any finding that Petitioner's parole had served its purpose, that

humanitarian reasons do not warrant Petitioner's presence in the country, or that he is a danger to

the public or a flight risk (meaning that the public interest does not warrant his presence in the

country). Thus, the email was legally insufficient to meet the statutory and regulatory

requirements, even though it cited those provisions and invoked the word "discretion."

Respondents may not "simply disregard rules that [were] still on the books."[112]

As Justice Alito commented in *Thuraissigiam*, as a noncitizen with connections in the

United States who is no longer at the "threshold of initial entry," Petitioner is entitled to due

---

[111] *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 700 (9th
Cir. 2012) (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426
F.3d 1082, 1091 (9th Cir. 2005)).

[112] *Fox Television*, 556 U.S. at 515.

process rights.[113] By failing to follow the requirements of either the Parole Statute or 8 C.F.R.

§ 212.5(e)(2)(i) in terminating Petitioner's parole, Respondents "failed entirely to take obligatory

procedural steps."[114] Respondents made "no findings at all on potentially dispositive issues"

regarding the termination of Petitioner's parole.[115] Multiple Supreme Court decisions have

concluded that there was "procedural error" when a "noncitizen was denied outright [the

procedure] required by then-governing law."[116] Thus, by denying Petitioner the required

procedure before purporting to terminate his parole, Respondents acted arbitrarily and

capriciously and violated the APA.

### 3.  Change of Position without Adequate Explanation

As a further ground for granting habeas relief, the Court notes that upon Petitioner's entry

into the United States, Respondents determined that Petitioner was suitable for parole.

Respondents have not provided a reasoned explanation or any changed circumstances that would

justify their current departure from their prior decision.[117] In fact, the changed circumstances in

the record weigh against terminating parole. When Petitioner arrived in the United States, he had

no ties to the community and his background was unknown. Now, after nearly two years'

presence in the United States, Petitioner has demonstrated ties to the community, has received a

second work authorization based on his asylum-seeking status, and has a record of compliance

with the law and the lawful requirements imposed by USCIS.

---

[113] 591 U.S. at 107.

[114] *See id.* at 156 (Breyer, J., concurring).

[115] *See id.* (cleaned up).

[116] *Id.* (gathering cases).

[117] *See Int'l Union, UAW*, 802 F.2d at 973-74.

It is Respondents' burden to "provide [a] reasoned explanation for [their] action."[118] "A reasonable basis exists where the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[119] "*Post hoc* explanations of agency action by . . . counsel cannot substitute for the agency's own articulation of the basis for its decision."[120] Respondents, however, provide no record evidence of an articulation by the agency of *any* reason for the change to terminate Petitioner's parole, let alone a "rational basis for its decision."[121] This "[u]nexplained inconsistency between agency actions is a reason for holding [the decision] to be an arbitrary and capricious change."[122] Even in immigration court, Respondents did not articulate a basis for dismissing the case that the Court could extrapolate as a reason for terminating parole[123]—the Government simply stated there were "changed circumstances," without explanation. Thus, this is an independent and alternative basis for finding Respondents' termination of Petitioner's parole arbitrary and capricious and a violation of the APA.

## CONCLUSION

The Court GRANTS the Petition for Writ of Habeas Corpus (ECF 1) based on Count Two and ORDERS Defendants immediately to release Petitioner from custody. Further, in

---

[118] *Fox Television*, 556 U.S. at 515.

[119] *Arrington*, 516 F.3d at 1112 (quotation marks omitted).

[120] *Id.* at 1113.

[121] *Id.* at 1112.

[122] *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quotation marks omitted).

[123] *Arrington*, 516 F.3d at 1112 (stating that courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (quotation marks omitted)).

aid of the Court's jurisdiction, which is hereby retained, the Court ORDERS pursuant to the All

Writs Act, 28 U.S.C. § 1651, that Defendants shall not cause Petitioner to be re-detained during

the pendency of his removal proceedings without prior leave of this Court. Finally, based on the

stipulation of the parties, the Court expresses no opinion on the merits of any other count alleged

in the Petition.

**IT IS SO ORDERED**.

DATED this 9th day of July, 2025.

Michael H. Simon
United States District Judge